Ellis I. and Nelle S. **LEVITT,**
**Appellants-Appellees**

v.

**UNITED STATES of America,**
**Appellees-Appellants**

Nos. 74–1572, 74–1582.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 10, 1975.

Decided June 5, 1975.

---

Jeffrey E. Lamson, Des Moines, Iowa, for plaintiffs-appellants.

Stephen M. Gelber, Atty., Appellate Section, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before BRIGHT and STEPHENSON, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

BRIGHT, Circuit Judge.

The appeal and cross-appeal in this case require that we interpret and apply to the circumstances disclosed by the record the provisions of § 265(2) of the Internal Revenue Act of 1954, as amended, 26 U.S.C. § 265(2) (1970), which disallows a deduction for interest "on indebtedness incurred or continued to purchase or carry obligations * * * the interest on which is wholly exempt from * * * [federal income] taxes * *."[1]

Taxpayer Nelle Levitt claimed for the years 1963–1965, inclusive, an interest deduction for loans from the Iowa-Des Moines National Bank (hereinafter Bank) carried to finance the purchase of United States Treasury bonds, the income from which is not exempt from taxation, when at all times she could have readily paid off the loans, or avoided them altogether by liquidation of her substantial holdings of tax-exempt municipal bonds.

Nelle's husband, Ellis Levitt, obtained loans from the Bank to purchase Treasury bonds while holding, as did Nelle Levitt, tax-exempt securities of substantially greater value than the amount of the loans. In common with his wife, he claimed interest deductions in the same years.

Additionally, during 1963–65, Ellis Levitt claimed interest deductions for his indebtedness to the Bank incurred to obtain funds to make certain other investments and, possibly, to repay a loan from his wife.[2]

The Commissioner rejected entirely the Levitts' deduction of interest on loans incurred to purchase the Treasury bonds and rejected in part Ellis Levitt's deduction of interest on his other loans.

After paying the deficiencies assessed by the Commissioner, Mr. and Mrs. Levitt brought this suit for refund of these additional taxes. The district court sustained the Commissioner's position on deficiencies for interest on loans attributable to the Levitts' acquisition of Treasury bonds but sustained Mr. Levitt's deduction of interest on other loans from the Bank.[3] The Levitts bring this appeal (No. 74–1572) and the Government cross-appeals (No. 74–1582).

We affirm the district court with respect to Mr. and Mrs. Levitt's appeal, but we sustain the Government's position in its cross-appeal and remand for a proper allocation of the interest deduction to be disallowed on Mr. Levitt's loans for purposes other than the purchase of Treasury bonds.

We will restate the operative facts as related in the district court opinion and as contained in the parties' stipulation of facts.

1. As pertinent here, § 265(2) reads as follows:
   No deduction shall be allowed for—
   * * * * * *
   (2) Interest. Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle.

This provision constitutes an exception to the general rule that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a) (1970).

2. See note 5 infra.

3. The district court opinion is reported at 368 F.Supp. 644 (S.D.Ia.1974).

*Nelle Levitt*

Since 1958 Mrs. Levitt has annually held in excess of $80,000 in tax-exempt municipal bonds. These holdings increased substantially from 1961 to 1965.[4] In October and December of 1960, she borrowed $84,000 from the Bank and applied the entire proceeds to purchase United States Treasury bonds. On September 9, 1964, she borrowed $85,891 from the Bank and purchased the same amount of Treasury bonds. In late December of 1965, she borrowed $40,000 and bought Treasury bonds in that amount. As of the end of 1964, she owned tax-exempts in the face amount of approximately $293,000; by the end of the calendar year 1965, she owned tax-exempts in the face amount of approximately $398,000. She retained all Treasury bonds acquired with bank loans; and her loan balance, equalling her investment in Treasury bonds and on which she had never paid any principal, totalled $209,891 at the end of 1965. According to the parties' briefs, Mrs. Levitt deposited no collateral (other than the Treasury bonds themselves) with the Bank as security for any of these loans. At year-end 1963, Mrs. Levitt's net worth exceeded $600,000 and, by year-end 1965, $1,000,000. She acquired the taxable United States Treasury bonds because, although purchased at a discount, they can be redeemed at par by her estate to pay federal estate taxes.

*Ellis Levitt*

The circumstances relating to Mr. Levitt's loans from the Bank for the purpose of purchasing Treasury bonds are similar to those of his wife. He owned tax-exempt securities in amounts substantially greater than the total value of the loans that he obtained from the Bank from 1959 through 1965. During this period he borrowed $415,000 for the specific purpose of purchasing United States Treasury bonds for the payment by his estate of federal estate taxes. In addition, Mr. Levitt borrowed $516,746 from the Bank during 1961 to 1965 for other purposes: (1) In 1961, he purchased from his employer the insurance policies carried by it on his life. He did so by borrowing $260,000 against the cash value of these policies. (2) In 1963, he borrowed $42,000 to purchase land for a real estate development—construction of a post office in Des Moines. (3) In 1964, he borrowed $107,072 for construction payments on this post office. (4) In 1965, he borrowed $67,674 to purchase real estate for investment; $40,000 to pay a liability incurred in a motel venture; and $27,000 to repay a loan to his wife.[5]

Mr. Levitt's loans were for varying terms, including notes payable upon de-

---

**4.** Mrs. Levitt's purchase of tax-exempts during the tax years in issue amounted to $495,806:

| Year | Amount | |
|------|--------|---|
| 1963 | $ 85,000 | (January 17, 29) |
| | 76,155 | (April through December) |
| 1964 | 113,042 | (January 1 through January 10) |
| | 5,039 | (June 15) |
| | 10,111 | (August 24) |
| 1965 | 44,605 | (June 22) |
| | 50,012 | (July 6) |
| | 56,031 | (July 12) |
| | 55,811 | (November 5) |
| TOTAL | $ 495,806 | |

**5.** The record does not make clear whether Mr. Levitt borrowed this $27,000 from the Bank. No reference is made to such borrowing in the statement of material facts admitted by both parties. However, in a summary of all of Ellis' borrowings the $27,000 is mentioned as having been borrowed to pay a loan from Nelle Levitt. A tabulation of bank loans shows no entry in 1965 to cover this $27,000 item. The loan balance referred to in the text equals $516,746, apart from any $27,000 loan made to repay Mrs. Levitt. The district court opinion recites, however, that this loan came from the Bank. 368 F.Supp. at 650. Neither the taxpayers' nor the Government's brief makes further mention of this item. Because the Government's objection to the interest deduction focuses on tax-exempts as collateral for bank borrowing, we assume that the Government does not press its claim for disallowance of interest on this loan unless it is included in the bank loan balance. The district court will have to determine on remand whether this $27,000 was, in fact, borrowed from the Bank.

mand, notes due in one year, notes due in less than one year, and notes renewable when due. During 1963–65, his bank borrowings increased as he renewed outstanding loans in addition to taking out new loans. As of September 18, 1963, he had deposited with the Bank $165,000 in tax-exempts, $250,000 in United States Treasury bonds, and $235,000 in insurance policies, totalling $650,000 at market value,[6] to carry his indebtedness, which then amounted to $545,000. On September 28, 1964, he reduced his deposited tax-exempt securities to $154,000 but, by August 31, 1965, these deposits increased to $261,000 as he raised his borrowings to $934,000. As his borrowings increased from 1963 through 1965, he deposited additional Treasury bonds and additional life insurance policies with increased cash values. Consequently, the Bank held a total of $981,000 in collateral for loans in the amount of $934,000 as of year-end 1965.

## I. *Legal Principles.*

■ The parties agree on the basic principles controlling this case but disagree as to their application. Those principles have been succinctly stated in Israelson v. United States, 367 F.Supp. 1104 (D.Md.1973), aff'd mem., 508 F.2d 838 (4th Cir. 1974):

> The following principles are well established. Section 265(2) does not become operative merely because the taxpayer incurred or continued indebtedness at the same time that he held tax-exempt securities. Rather, the Commissioner must establish a sufficiently direct relationship between the debt and the carrying of the tax-exempt bonds. The touchstone for decision is the *purpose* of the taxpayer in incurring or continuing the indebtedness. A finding of a taxpayer's purpose does not depend solely upon looking into his mind and learning what he was thinking; although his intentions are relevant, his purpose may be inferred from his conduct and from the

circumstances that confronted him. The taxpayer has the burden of overcoming the presumption of validity of the Commissioner's determination of deficiencies. [*Id.* at 1106–07 (emphasis in original).]

In Illinois Terminal R. R. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967), the court enunciated the test for proving a tax-avoidance relationship between continuing a loan and purchasing or carrying tax-exempts:

> The real issue here is whether the remaining loan, regardless of its size of correlation with the cost basis of other assets, was continued for the purpose of enabling plaintiff to own the Series "B" bonds of the city of Venice. Of course, the resolution of this issue requires a connection-type inquiry, which will be somewhat different from the inquiry into situations where the issue is whether indebtedness was incurred to purchase tax-exempt bonds. It is necessary to establish a sufficiently direct relationship of the continuance of the debt for the purpose of carrying the tax-exempt bonds. [*Id.* at 1020–21.]

*See also* Bishop v. Commissioner, 41 T.C. 154, 159–61 (1963), aff'd, 342 F.2d 757 (6th Cir. 1965). The court then concluded:

> What plaintiff seeks to do is to receive tax-free income and at the same time deduct the interest expense attributable to obtaining that tax-free income. This is the double benefit prohibited by section 265(2). A business cannot escape taxation of income by the device of purchasing or carrying tax-exempt securities with borrowed money not required to carry on its regular functions. [375 F.2d at 1021.]

In a recent decision, the Tax Court repeated the need to prove a direct relationship between a borrowing or its continuation and the purchase or carrying of tax-exempt securities before § 265(2) becomes operative:

---

**6.** Unless otherwise indicated, all references to the amount of collateral are to its market, rather than face, value.

Section 265(2) does not become operative merely because the taxpayer incurred or continued indebtedness at the same time that he held tax-exempt securities. "The mere simultaneous existence of an indebtedness and the holding of tax-exempt securities does not cause section 265(2) to apply." * * * Rather, section 265(2) is applicable only when "the *purpose* for which the indebtedness is incurred or continued is to purchase or carry tax-exempt obligations" (emphasis supplied). * * * Thus, the deduction will be disallowed only where there is a "sufficiently direct relationship" between the incurrence or continuance of the indebtedness and the purchasing or carrying of the tax-exempt securities. [Mariorenzi v. Commissioner, 32 T.C.M. 681, 684 (1973), aff'd per curiam, 490 F.2d 92 (1st Cir. 1974) (citations omitted).]

■ In addition to general circumstances demonstrating a direct relationship between the acquisition or carrying of tax-exempts and a borrowing or continuation of borrowing, that direct relationship, evidencing the taxpayer's purpose to borrow or continue a loan in order to acquire or carry the tax-exempts, is deemed established if tax-exempt securities are used as collateral to incur or continue short-term loans. Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420, 422–23 (7th Cir. 1968); Phipps v. United States, 515 F.2d 1099, 1102 (Ct.Cl.1975); *cf.* Norfolk Shipbuilding & Drydock Corp. v. United States, 321 F.Supp. 222, 231 (E.D.Va.1971); Ball v. Commissioner, 54 T.C. 1200, 1205–07 (1970).

In Wisconsin Cheeseman, Inc. v. United States, *supra,* the court observed that there is no difference in effect, for tax purposes, between borrowing to directly buy tax-exempts and borrowing by using tax-exempts as collateral:

Under Section 265(2), it is clear that a taxpayer may not deduct interest on indebtedness when the proceeds of the loan are used to buy tax-exempts. 4A Mertens, Law of Federal Income Taxation (1966 ed.) § 26.13 and cases cited. Applying the rule that the substance of the transaction is controlling in determining the tax liability, the same result should follow when the tax-exempt securities are used as collateral for a loan. Surely one who borrows to buy tax-exempts and one who borrows against tax-exempts already owned are in virtually the same economic position. Section 265(2) makes no distinction between them. [388 F.2d at 422.]

■ Simply stated, § 265(2) prevents a taxpayer from simultaneously paying no tax on income from tax-exempt securities and deducting interest on loans that he would not be incurring or continuing but for his desire to acquire or carry the tax-exempts.

With these principles in mind, we examine the taxpayers' transactions.

## II. *Application of the Legal Principles.*

### A. *Treasury Bond Purchases.*

■ Mr. and Mrs. Levitt purchased United States Treasury bonds for the sole purpose of reducing the amounts which their respective estates would actually pay in estate taxes. The taxpayers advanced no independent business reason, except future tax benefits, to justify holding the tax-exempts while borrowing to obtain funds to directly purchase the Treasury bonds.[7] *Compare* Illinois Terminal R. R. v. United States, *supra,* 375 F.2d at 1021; Bradford v. Commissioner, 60 T.C. 253, 259 (1973). The fact that the borrowing may have been advantageous for federal estate tax purposes does not evidence a purpose unrelated to the taxpayers' purchase and holding a tax-exempt securities. Rather,

---

7. The district court found that

[t]here is no good business reason, other than the desire to carry tax-exempt securities, offered why the tax exempts or trust

income were not used [by Nelle Levitt] to purchase the government bonds rather than borrow additional sums from the bank. [368 F.Supp. at 647.]

the absence of any adequate business justification for the loans compels the conclusion that the taxpayer borrowed money in order to retain his or her tax-exempts. *See* Mariorenzi v. Commissioner, *supra*, 32 T.C.M. at 685.

Congress has allowed the deduction of interest on indebtedness, *see* 26 U.S.C. § 163(a), in order to tax only gains and not gross income. Leslie v. Commissioner, 413 F.2d 636, 640 (2d Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). By retaining all of their tax-exempt securities while borrowing to purchase taxable securities, the Levitts have, in effect, financed an estate tax reduction plan. The entire justification for the interest deduction is undercut in this case, for the interest expense incurred on the indebtedness was directly and purposefully offset by income on which there was no tax. Leslie v. Commissioner, *supra*, 413 F.2d at 640.

Taxpayers make the further argument that the language in the parenthetical phrase of § 265(2) discloses a congressional intent to create a safe and untouchable haven for interest on any borrowing incurred or continued in connection with the purchase of obligations of the United States:

No deduction shall be allowed for—

\* \* \* \* \* \*

\* \* \* Interest on indebtedness incurred or continued to purchase or carry obligations (*other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer*) the interest on which is wholly exempt from the taxes imposed by this subtitle. [Emphasis added.]

In making this argument the taxpayers direct our attention to a regulation of the Internal Revenue Service, promulgated pursuant to § 265(2), which expressly authorizes deduction of interest on loans for the purchase of obligations of the United States:

Interest paid or accrued within the taxable year on indebtedness incurred

or continued to purchase or carry (a) obligations of the United States issued after September 24, 1917, the interest on which is not wholly exempt from the taxes imposed under subtitle A of the Code \* \* \* is deductible. [26 C.F.R. § 1.265–2(1963).]

The district court rejected the taxpayers' contention that this parenthetical statutory language, as explained in the regulation, authorizes deduction of interest on borrowings to purchase Treasury bonds in the circumstances of these cases:

Taxpayers' reading of the regulation appears to arrive at the conclusion that, because the regulation permits interest deductions for loans used to buy treasury bonds, then the mere fact a taxpayer is carrying or continuing loans to carry tax-exempt bonds is of no effect. If taxpayers' argument was followed to its logical conclusion, it would be possible for a person to carry as many tax-exempt bonds as he could afford, while at the same time borrow any amount of money he desired to purchase U.S. Treasury Bonds and still be able to deduct the interest payments on the loans. Such a theory would legitimize double deductions and in my opinion completely controvert Congressional intent in the passage of section 265(2). [368 F.Supp. at 648.]

We completely agree with the district court's reasoning. The parenthetical phrase in § 265(2) apparently serves to distinguish the World War I tax-exempt Liberty Bonds from the later taxable Treasury bonds and to ensure that the latter, as non-exempt bonds, fell into a tax category different from that of Liberty Bonds. *See* Treasury Regulations 62 (1921 Revenue Act), art. 121. The regulation, § 1.265–2, specifies only that interest paid on indebtedness to purchase these later taxable bonds would be a deductible item under the general rule for deductibility of interest. But this language does not create a special tax haven for interest on debts incurred to buy Treasury bonds where the debt de-

signedly facilitates the purchasing or carrying of tax-exempt securities.

## B. *Mr. Levitt's Business Loans.*

The district court approved the deduction of interest on Mr. Levitt's borrowings to acquire life insurance policies and for investment in real estate ventures. Because the trial court found no direct relationship between carrying the tax-exempts and obtaining these loans, it held that the interest was properly deductible.

■ With respect to the acquisition of life insurance policies, the trial court found that

> the necessity for their purchase grew out of a situation over which Mr. Levitt did not have control. This appeared to be a legitimate long term investment * * * and here his motive was to create a profitable investment and to protect the value of the insurance polic[ies] and avoid surrender for cash value. This was a major non-recurring outlay of cash for business reasons and it would be reasonable not to sacrifice the liquidity of the tax exempt [securities] to finance such a commitment. [368 F.Supp. at 649.]

The trial court made a similar analysis of the indebtedness incurred relative to Ellis' real estate ventures:

> [T]hese investments are major, nonrecurring items. Business reasons were the motivation for the incurring of the indebtedness to finance the new ventures. [*Id.* at 649.][8]

The trial court based its holding, with respect to these borrowings, upon Ball v. Commissioner, 54 T.C. 1200 (1970). Its reliance upon *Ball* cannot be sustained, however, for the Tax Court's opinion in *Ball* makes clear that "[n]o tax-exempt security * * * was used as collateral for any loan made by petitioner [taxpayer] and outstanding at any time during

the taxable period." *Id.* at 1205. Appellant Ellis Levitt's reliance upon Batten v. United States, 322 F.Supp. 629 (E.D. Va.1971), is equally misplaced, for there the taxpayer's small holding of tax-exempts in no way supported an indebtedness incurred to liquidate a deceased associate's interest in a business.

Here, in contrast to the facts in *Ball* and *Batten*, the record discloses that on September 18, 1963, Ellis Levitt's new loan balance of $545,000 was supported by $165,000 of tax-exempts in custody of the Bank and $485,000 of other collateral. On March 12, 1964, the new bank loan balance of $631,000 was supported by the same tax-exempts and $571,000 of other collateral. On September 28, 1964, the bank balance rose to $812,000, supported by collateral of $154,000 in tax-exempts, and $682,000 in Treasury bonds and insurance policies. By August 31, 1965, the loan balance had increased to $934,000, supported by $261,000 in tax-exempts and $720,000 in other collateral.

Although the court characterized the purchase of insurance policies and investment in real estate ventures as long-term investments, 368 F.Supp. at 649, the record shows that the borrowings underlying these investments comprised demand notes or notes for a term no longer than one year. The crucial fact is that with each new loan the borrower, presumably at the lender's request, deposited or maintained tax-exempts as collateral to partially support the loan balance. Thus, the taxpayer incurred or continued his indebtedness in order to carry the tax-exempt securities. *See* Wisconsin Cheeseman, Inc. v. United States, *supra*, 388 F.2d at 422–23; Phipps v. United States, *supra*, 1515 F.2d at 1102. Consequently, the deduction of interest paid to the Bank on the loans to purchase life insurance policies and to make real estate investments must be

---

8. Although we accept this finding by the court of the taxpayer's motivation, that motivation becomes immaterial in light of the independent use of tax-exempts as collateral for the bank loans at issue. *See* Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420, 422–23 (7th Cir. 1968); *see also* Phipps v. United States, 515 F.2d 1099, 1102 (Ct.Cl.1975); *cf.* Leslie v. Commissioner, 413 F.2d 636, 639–40 (2d Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970).

disallowed in direct proportion as the loans were supported by tax-exempts deposited with the Bank as collateral. Or, to state the matter conversely, an interest deduction is allowable to the extent that the loans were supported by collateral other than tax-exempt bonds.

In its briefs, the Government discusses in detail the proper formulae for computing the interest deduction to be disallowed because of Mr. Levitt's incurring and continuing loans in order to purchase and carry tax-exempts. The Government urges us to adopt its application of the principles of Revenue Procedure 72–18, §§ 7.01, .02, 1972–1 Cum. Bull. 740, 743, to the facts of Mr. Levitt's case. The district court evaluated neither the merit, if any, of the Government's proposal nor whether the proffered formulae are consistent with the principles expressed in the Revenue Procedure. Instead, it expressly refrained from considering the matter:

> The parties in this case have agreed between themselves that the Court need not make a determination of the amount of the refunds due * * *. Instead, the parties have indicated to the Court that they will work out a distribution, subject to the approval of the Court, in accordance with the ruling in this case. The Court is of the opinion that this distribution should be agreed upon by the parties within 30 days from the filing of this opinion, and then submitted to the Court for final approval. [368 F.Supp. at 650.]

The plan submitted to the court by the parties pursuant to this directive provided, consistently with the district court's holding, only for disallowance of interest on loans incurred to purchase Treasury bonds, and the parties stipulated the correctness of the computations and procedure for arriving at the disallowance.

Thus, the court below has had no occasion to consider the Government's contentions on appeal with respect to the proper computation of the interest deduction disallowance.

■ It is axiomatic that issues not raised below may not, in the absence of extraordinary circumstances, be raised on appeal. *E. g.*, Brennan v. Maxey's Yamaha, Inc., 513 F.2d 179, 184 (8th Cir. 1975); Gulf Shores Leasing Corp. v. Avis Rent-A-Car System, Inc., 441 F.2d 1385, 1391–92 (5th Cir.), cert. dismissed, 404 U.S. 953, 92 S.Ct. 305, 30 L.Ed.2d 270 (1971). Accordingly, we decline to accept the Government's invitation to decide the proper formulae for computing the amount of interest to be disallowed on that part of Mr. Levitt's loan balance incurred for purposes other than the purchase of the Treasury bonds referred to in Part II A of this opinion.

We remand Mr. Levitt's case for a determination of the interest allocable to loans incurred or continued to carry the taxpayer's holdings of tax-exempt securities. Although the district court found that the loans for purposes other than the purchase of Treasury bonds served legitimate business purposes and were not incurred or continued purposefully to carry the tax-exempt municipals, we nevertheless have concluded that the use of tax-exempt municipals as collateral in part taints these loans, thereby requiring allocation. *See* Rev.Proc. 72–18, §§ 7.01, .02, 1972–1 Cum.Bull. 740, 743. Thus, we believe that Mr. Levitt's interest deduction on these other loans should be apportioned to provide for disallowance of interest on that part of each loan which is supported by the collateral of tax-exempt municipal bonds deposited with the Bank as of the date of the interest payment on it. We remand for proper allocation.