[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED NOVEMBER 29, 1994
These consolidated tax appeals raise an issue of considerable importance to Connecticut brokers who buy and sell municipal obligations. The question presented is whether these brokers are entitled to deduct as a business expense the interest that they pay on the money that they borrow to carry their inventory. In order to answer this question, I must consider both statutory and constitutional issues. CT Page 12134
The two cases presented here involve different taxable years but are otherwise identical. The facts have been fully stipulated and can be very briefly stated.
D.A. Pincus Co., Inc. ("Pincus"), the plaintiff, is an incorporated broker dealer authorized to do business in Connecticut. It is engaged in the business of buying and selling municipal obligations. In conducting this business, it carries an inventory of these obligations. The act of carrying this inventory results in both income and expense. The income comes from interest earned on the obligations while Pincus carries them. The expense results from the fact that money is borrowed to carry the inventory. Interest must be paid on the resulting loans. The differing state and federal tax consequences of the interest paid and the interest earned lie at the heart of this case.
The interest earned on the obligations is tax-exempt under federal law but taxable under state law.26 U.S.C. § 103(a) provides that, for federal income tax purposes, "gross income does not include interest on any State or local bond." In contrast, the Connecticut corporation business tax subjects this same interest income to state taxation. Connecticut Bank Trust Co.v. Tax Commissioner, 178 Conn. 243, 423 A.2d 883
(1979). Pincus duly reports this income on its state corporation business tax return.
The state and federal tax consequences of the interest that Pincus earns are undisputed. What divides the parties here is the tax consequences of the interest that Pincus pays. As a general rule, 26 U.S.C. § 163(a) allows as a deduction "all interest paid or accrued within the taxable year on indebtedness." The specific interest that Pincus pays is, however, governed by another provision of the Internal Revenue Code.26 U.S.C. § 265(a) provides that, for federal tax purposes, "No deduction shall be allowed for . . . (2) [i]nterest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from the taxes imposed by this subtitle."
Because of § 265(a)(2) it is clear that Pincus cannot CT Page 12135 deduct the interest that it pays on its federal tax return. As will be explained in some detail below, this is an entirely just result since the interest that Pincus earns is exempt from federal taxation. But the same earned interest is, at the same time, taxable by the state. What is the status of the interest paid for state tax purposes? That is the question presented.
Conn. Gen. Stat. § 12-217(a)(A) allows as a deduction for corporation business tax purposes "all itemsdeductible under the federal corporation net income tax law." (Emphasis added.) Viewing this provision with what might gently be described as optimism, Pincus deducted its interest payments on its Connecticut Corporation business tax return. After an audit, the Department of Revenue Services ("DRS") disallowed the deductions. This appeal has now followed. On appeal, Pincus advances both statutory and constitutional arguments, which will be now considered in turn.
Pincus's statutory argument can be quickly dispatched. It essentially argues that the interest expenses in question are "deductible" under 26 U.S.C. § 163(a), at least if that provision is considered alone. Section 265(a)(2), of course, specifically prohibits the deduction of these expenses, but to Pincus this simply means that the expenses in question now inhabit some sort of linguistic netherworld where they remain "deductible" but simply cannot be deducted. This argument is nonsensical. Section 265(a) provides that "[n]o deduction shall be allowed" for these expenses. In plain English, this means that they are not federally "deductible." See Skaarup Shipping Corp. v. Commissionerof Revenue Services, 199 Conn. 346, 353,507 A.2d 988 (1986) ("deductible" means "deductible for this taxpayer"). Pincus's textual argument to the contrary is to no avail.
Pincus's constitutional argument, however, is much more formidable. It points out that broker dealers carrying inventories of federally taxable obligations, such as corporate stocks and bonds, can deduct the interest on indebtedness that those broker dealers incur to carry their respective obligations. Pincus CT Page 12136 argues that there is no rational basis to distinguish, for state tax purposes, between a corporation that buys and sells such obligations and a corporation that buys and sells municipal obligations, since both
corporations are taxable for state tax purposes. Consequently, Pincus claims, Conn. Gen. Stat. § 12-217(a)(A) as applied violates the equal protection clauses of the state and federal constitutions. U.S. Const. amend. XIV, § 1; Conn. Const. Art. First, § 20 (amended in ways unrelated to this case by Conn. Const. amend. XXI). Equal protection challenges to tax legislation are difficult to maintain because of the great deference that must be given the legislature in this area. See, e.g.,Johnson v. Meehan, 225 Conn. 528, 536-37,626 A.2d 244 (1993). Nevertheless, the operation of § 12-217(a)(A) is so completely arbitrary in this case that Pincus's equal protection argument must prevail.
The essence of Pincus's argument can be illustrated by a simple hypothetical. Suppose that two corporations are broker dealers in Connecticut. Corporation A carries an inventory of federally taxable obligations. Corporation B — like Pincus — carries an inventory of municipal obligations. Each corporation earns $100 in interest on its inventory and pays $100 in interest on loans incurred to carry that inventory. Under federallaw, the corporations are similarly treated. Corporation A has a gross income of $100, a deduction of $100 (under 163(a)), and a net income of zero. Corporation B has a gross income of zero (as a result of 103(a)), a deduction of zero (as a result of § 265(a)), and a net income of zero.
Now consider the fortunes of these two hypothetical corporations under Connecticut law. Corporation A again has a gross income of $100, a deduction of $100 (because the $100 is "deductible" under federal law), and a net income of zero. Corporation B, however, has a net income of $100, a deduction of zero (because its
$100 expense is not federally "deductible"), and a net income of $100. But for Corporation B's inventory, these two corporations are identical in every way and, in particular, have identical net incomes. The disparity in their treatment by § 12-217(a)(A) is, however, dramatic in the extreme. This is, moreover, not a case like CT Page 12137Bolt Technology Corp. v. Dubno, 213 Conn. 220, 231,567 A.2d 371 (1989), which holds that, if a corporation can conduct its business in either of two ways, it cannot complain about the tax consequences of its choice. The discrimination here is one that works to the detriment of all broker dealers in municipal obligations. The DRS candidly admits, in the portion of its brief addressed to Pincus's statutory argument, that this disparate treatment is "unfair" but argues that "the fairness of the tax is within the prerogative of the legislature and not of this court." Defendant's Trial Brief at 7. These claims must be considered in some detail.
Before the merits of these claims are reached, the appropriate standard of review must be discussed. Equal protection analysis, as is well known, "affords varying levels of review to equal protection claims depending upon the classes of persons protected thereby." Daly v. Del Ponte, 225 Conn. 499, 513,624 A.2d 876 (1993). An equal protection challenge to social and economic legislation that does not infringe upon a fundamental right or affect a suspect group triggers the least restrictive level of judicial review — the rational basis test. Johnson v. Meehan, supra,225 Conn. at 535. Under this test, "the classification drawn by the statute will not violate the equal protection clause if it is rationally related to a legitimate public interest." Id. While "[i]n appropriate circumstances," our Supreme Court has "interpreted the equal protection provisions of the state constitution differently than that contained in the federal constitution,"Daly v. Del Ponte, supra, 225 Conn. at 513, the rational basis tests of the two constitutions appear on the basis of present jurisprudence to be substantially the same.
Despite the seeming narrowness of the issue, the Supreme Court of the United States has not been entirely consistent over the years in articulating the exact phraseology of the rational basis test to be applied in tax cases. In 1920, during what might fairly be called an interventionist age, the Court stated that:
[T]he classification must be reasonable, not arbitrary, CT Page 12138 and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. The latitude of discretion is notably wide in the classification of property for purposes of taxation and the granting of partial or total exemptions upon grounds of policy . . . Nevertheless, a discriminatory tax law cannot be sustained against the complaint of a party aggrieved if the classification appear to be altogether illusory.
R.F. Royster Guano Co. v. Virginia, 253 U.S. 412, 415
(1920). Two decades later, at the height of the New Deal, the pendulum had swung and a highly deferential Court stated that, in tax cases, "[T]he presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes." Madden v. Kentucky, 309 U.S. 83,88 (1940).
The analyses of Royster and Madden are not entirely congruent, although both cases continue to be favorably cited. Compare Zapata v. Burns, 207 Conn. 496,507, 542 A.2d 700 (1988) (citing Royster), withGallacher v. Commissioner, 221 Conn. 166, 182,602 A.2d 996 (1992) (citing Madden). Nevertheless, considerable doubt was cast on the continuing validity ofRoyster in United States Railroad Retirement Board v.Fritz, 449 U.S. 166, 174-75 (1980), and Royster might appropriately be viewed as a product of its by-gone era.Madden, in comparison, retains considerable viability, but, at least to some extent, it is a product of its era as well. In recent years, the Supreme Court has articulated an equal protection approach to tax legislation that, while highly deferential, is on balance somewhat less overtly hostile to equal protection challenges thanMadden. The most recent summary of the Court's modern equal protection approach to tax cases is as follows:
 In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification . . . the legislative facts on which the CT Page 12139 classification is apparently based rationally may have been considered to be true by the governmental decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . This standard is especially deferential in the context of classifications made by complex tax laws. "[I]n structuring internal taxation schemes `the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.[']" Williams v. Vermont, 472 U.S. 14, 22 . . . (1985), quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 359 . . . (1973).
Nordlinger v. Hahn, 112 S.Ct. 2326, 2332 (1992). This standard, which focuses, with appropriate deference, on whether "the relationship of the classification to its goal is . . . so attenuated as to render the distinction arbitrary or irrational," is the governing standard in this case.
One other preliminary problem must be mentioned before the merits of Pincus's equal protection challenge can be considered. The legislature in enacting Conn. Gen. Stat. § 12-217(a)(A) did not expressly consider the problem of broker dealers in municipal obligations. The problem in this case is not that such broker dealers have been expressly singled out for what turns out to be oppressive treatment but that these dealers were not thought about at all. In technical terms, § 12-217(a)(A) presents an underinclusive classification. "Under-inclusion occurs when a state benefits or burdens persons in a manner that furthers a legitimate public purpose but does not confer this same benefit or place this same burden on others who are similarly situated." Developments in the Law —Equal Protection, 82 Harv.L.Rev. 1065, 1084 (1969). Underinclusive laws are ordinarily tolerated because legislatures may attack general problems in piecemeal fashion, but it is possible for a particular underinclusion to be "so arbitrary as to deny equal protection."Id. "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes . . . It also imposes a requirement CT Page 12140 of some rationality in the nature of the class singled out." Rinaldi v. Yaeger, 384 U.S. 305, 308-09
(1966). As in all equal protection cases, the question is whether the distinction that results is arbitrary or irrational in light of the statute's purpose. Id. 309.
In considering the rationality of the different treatment of dealers in federally taxable obligations and dealers in municipal obligations under Conn. Gen. Stat. § 12-217(a)(A), a brief review of relevant federal tax history is helpful. The United States Supreme Court held a century ago in Pollock v. Farmer's Loan Trust Co., 157 U.S. 429, 583-86 (1895), that the federal government could not constitutionally tax the income derived from municipal bonds. Pollock has since been overruled as a constitutional matter bySouth Carolina v. Baker, 485 U.S. 505, 515-27 (1988), but Congress has chosen as a matter of public policy to continue to confer this benefit. 26 U.S.C. § 103(a).
The federal tax status of interest paid by dealers in municipal obligations to carry their inventories was altered by Congress during World War I. Section 5(a) of the Revenue Act of 1916 allowed as a deduction "[a]ll interest paid within the year on . . . indebtedness."39 Stat. 756, 759 (1916). The War Revenue Act of 1917 amended § 5(a) to exclude "indebtedness incurred for the purchase of obligations or securities the interest upon which is exempt from taxation as income under this title." 40 Stat. 300, 330 (1917). This exclusion was broadened by the Revenue Act of 1918 to "indebtedness incurred or continued to purchase or carry" such obligations or securities. 40 Stat. 1057, 1066 (1919). This is the language now codified in26 U.S.C. § 265(a)(2).
The validity of this exclusion was upheld by the Supreme Court in Denman v. Slayton, 282 U.S. 514
(1931). Denman's reasoning is of considerable importance in the present case. Slayton, a dealer in tax-exempt municipal bonds, claimed that his inability to deduct the interest that he paid to carry his portfolio unconstitutionally discriminated against him. The Supreme Court unanimously disagreed. In its view, Congress, by prohibiting both the taxation of interest CT Page 12141 received and the deductibility of interest paid by such dealers, had enacted a "reasonable classification designed to subject all to the payment of their just share of a burden fairly imposed." Id. at 519. The purpose of this classification "was to prevent the escape from taxation of income properly subject thereto by the purchase of exempt securities with borrowed money."Id. Under Slayton's theory, the Court explained,
 "A," with an income of $10,000 arising from nonexempt securities, by the simple expedient of purchasing exempt ones with borrowed funds and paying $10,000 interest thereon, would escape all taxation upon receipts from both sources. It was proper to make provision to prevent such a possibility. The classification complained of is not arbitrary, makes no improper discrimination, does not result in defeating any guaranteed exemption, and was within the power of Congress.
Id. at 519-20.
The underlying principal of Denman v. Slayton is that "the tax laws may require tax-exempt income to pay its way." United States v. Atlas Life Insurance Co.,381 U.S. 233, 247 (1965). Similarly, the purpose of26 U.S.C. § 265(a) "is to prevent taxpayers from reaping a double tax benefit by receiving tax-exempt income from securities purchased or carried with borrowed money, and then claiming a deduction against their taxable income for the interest expense paid on the borrowed funds." Barenholtz v. United States, 784 F.2d 375,379 (Fed. Cir. 1986). Accord E.F. Hutton Group,Inc. v. United States, 811 F.2d 581, 582-83 n. 3 (Fed. Cir. 1987); Wynn v. United States, 288 F. Sup. 797,802 (E.D. Pa. 1968), aff'd, 411 F.2d 614 (3d Cir. 1969),cert. denied, 396 U.S. 1008 (1970). Any other result would, as Denman implicitly recognizes, be arbitrary and unfair. 282 U.S. at 519-20.
An arbitrary and unfair result is, however, exactly what happens when Conn. Gen. Stat. § 12-217(a)(A) is applied to the facts of this case. "The reason for allowing a deduction for interest expenses is that Congress intended that only gains be taxed, rather CT Page 12142 than gross income." Leslie v. Commissioner, 413 F.2d 636,640 (2d Cir. 1969), cert. denied, 396 U.S. 1007
(1970). This principle is undercut when the state taxes gross income rather than actual gains. That is, however, exactly what has occurred here.
The legislature history of § 12-217(a)(A) contains nothing to indicate that the legislature ever intended this result to occur or, for that matter, ever thought about the problem. When the corporation business tax was first enacted in 1935, it allowed the deduction of "all items deductible under the federal corporation net income tax law" but excepted "interest . . . paid during the income year." Conn. Gen. Stat., 1935 Cum. Supp., § 419C. Under this original formulation, dealers in federally taxable obligations and dealers in federally tax-exempt obligations were treated equally — albeit equally harshly — since neither could deduct the interest that they expended to carry their portfolios. In 1981, however, the "interest paid" exclusion was repealed. 1981 Conn. Acts No. 81-411, § 1. The 1981 act allowed dealers in federally taxable obligations to deduct the interest they paid to carry their portfolios, since their interest payments were, of course, federally "deductible." Dealers in federally tax-exempt obligations — like Pincus — were still treated with the harshness of old because their interest payments were not
federally "deductible." This distinction appears to have been a wholly unintended consequence of the 1981 legislation.[1]
The failure of the legislature to articulate a reason for treating dealers like Pincus more harshly than dealers in federally taxable obligations is not dispositive. The question that must be addressed is whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification."F.C.C. v. Beach Communications, Inc., 113 S.Ct. 2096,2101 (1993). The discrimination against dealers like Pincus could most obviously be justified if the State were attempting to discourage traffic in municipal obligations. Compare Conn. Gen. Stat. §§ 12-650, et seq. (imposing a tax on marijuana and controlled substances in an obvious attempt to discourage their use). The DRS, however, candidly disavows any such CT Page 12143 attempt as a conceivable basis of § 12-217(a)(A). Instead, the DRS — which, as already, noted, admits that the statute's treatment of Pincus is "unfair" — posits two conceivable bases of the discrimination in question. Neither of these proposed bases can withstand the most minimal scrutiny.
The first conceivable basis suggested by the DRS is that the federal tax exemption enjoyed by Pincus on the interest it earns from municipal obligations is a tax benefit conferred by the federal government. This benefit, the DRS claims, gives Pincus an "overall tax burden" that is less than that imposed on investors in corporate bonds, since the latter class is subject to both state and federal taxation. In doing what it has done, the DRS goes on to say, "the Connecticut legislature has more or less equalized the classes as regards the overall tax burden imposed by the two systems of taxation, federal and state." Reply Brief of Defendant at 2.
This first rationalization, with all possible deference, makes no sense. It is true that holders of municipal obligations receive a tax benefit that holders of corporate obligations do not enjoy. That is the manifest purpose of 26 U.S.C. § 265(a). It is probably also true that the legislature could, if it wished, "level the playing field" in some minimally rational way. If, for example, the legislature chose to tax the net income from municipal obligations at a higher rate than it taxes the net income from other obligations, the DRS's rationalization might make some minimal sense. But the relationship of the classification to its goal must not be "so attenuated as to render the distinction arbitrary or irrational." Nordlinger v. Hahn, supra,112 S.Ct. at 2332. Here, the State has taxed the gross
income of dealers like Pincus while taxing the net
income of dealers in federally taxable obligations. This makes no sense whatsoever. As the hypothetical given earlier illustrates, the disparity in treatment between Pincus and dealers in federally taxable obligations is dramatic and wholly arbitrary. This disparity in no way "levels the playing field." Rather, it creates two very different playing fields with very different rules. The question that must be asked is whether this CT Page 12144 difference in treatment has "any rational connection with proper legislative objectives." Miller v. Heffernan,173 Conn. 506, 515, 378 A.2d 572 (1977), appealdismissed, 434 U.S. 1057 (1978). The disparate treatment here has no rational connection with proper legislative objectives. Instead, it is "palpably arbitrary."Id.
The second conceivable basis for this distinction suggested by the DRS is even less tenable than the first. The DRS claims that, "[T]he interest paid on municipal bonds and therefore the income generated from them is lower than that paid on corporate bonds because they are exempt from federal tax and because they are a lower risk investment." Reply Brief of Defendant at 3. The unstated implication is that this "distinction" is a rational basis for the differing tax treatments in question. It is difficult to treat this argument seriously. In its first argument, the DRS claimed that holders of municipal obligations enjoyed a special tax benefit at the federal level and thus, by implication, earned more, after federal taxes, than holders of federally taxable obligations. This was the asserted justification for "equaliz[ing] the classes" by harsher taxation at the state level. Now, in its second argument, the DRS claims that holders of municipal obligations earn less than holders of federally taxable obligations. Assuming this to be true, it must be asked if this is a conceivable basis for taxing holders of municipal obligations even more oppressively at the state level — for kicking them when they are down, as it were. This distinction might make some sense if the State were attempting to discourage traffic in municipal obligations, but, as already mentioned, the DRS expressly repudiates any such goal. This possibility having been dismissed, there is no remaining policy reason for the classification that is even remotely plausible. See Nordlinger v. Hahn, supra,112 S.Ct. at 2332.
"Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."Regan v. Taxation with Representation of Washington,461 U.S. 540, 547 (1983). But, while extremely broad, this latitude is not altogether unlimited. Even in tax CT Page 12145 matters, the Equal Protection Clause prohibits the utterly capricious and the palpably arbitrary. "This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no more effective guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." RailwayExpress Agency, Inc. v. New York, 336 U.S. 106, 112
(1949) (Jackson, J., concurring).
This is one of the exceedingly rare cases in which an equal protection challenge to a tax statute must succeed. The reason that the challenge must succeed is not simply because the treatment of Pincus by § 12-217(a)(A) is unfair. "[T]he fairness of the . . . tax is within the prerogative of the legislature, and not of this court." Yaeger v. Dubno, 188 Conn. 206, 213,449 A.2d 144 (1982). It is because the different treatment given dealers in federally taxable obligations and dealers in federally tax-exempt obligations does not rest on any rational basis whatsoever. This difference in treatment is a fortuitous result of statutory language that the legislature, in all probability, did not intend and that cannot possibly be justified by any conceivable basis now advanced. A tax statute, like other statutes, "is unconstitutional, as applied, if it treats similarly situated persons differently and the different treatment does not rest upon some reasonable consideration of legislative policy." Oxx v. Vermont Department ofTaxes, 618 A.2d 1321, 1324 (Vt. 1992). Section 12-217(a)(A), as applied to Pincus, is such a statute.
The final matter that must be considered is the appropriate remedy. "`Where a statute is defective because of under-inclusion,' Mr. Justice Harlan noted, `there exist two remedial alternatives: a court may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion.' Welsh v. United States, 398 U.S. 333, 361
(1970) (concurring in result)." Califano v. Wescott,443 U.S. 76, 89 (1979). "This court's task is to discern what course the Legislature would have chosen to follow if CT Page 12146 it had foreseen our conclusions as to under-inclusiveness."People v. Liberta, 474 N.E.2d 567, 578 (N Y 1984), cert. denied, 471 U.S. 1020 (1985). This is an easy task in the present case. The legislature, in enacting § 12-217(a)(A), plainly intended interest payments to be broadly deductible, and it is only because of a fluke that Pincus has been unable to deduct its interest payments here. It would be a simple matter, for purposes of calculating Connecticut's corporation business tax, to allow dealers in municipal obligations to deduct the interest they pay to carry their portfolios. "That is what should have occurred in this case." Oxxv. Vermont Department of Taxes, supra,618 A.2d at 1325.
Judgment shall enter for the plaintiff in both cases.